# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| CLARENCE R. DODGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CV-92-TS |
| | ) | |
| THE LINCOLN NATIONAL LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In this reverse sex discrimination suit, the Plaintiff, Clarence R. Dodge, claims that the Defendant, The Lincoln National Life Insurance Company (Lincoln Life), violated Title VII of the Civil Rights Act of 1964 when it selected a significantly less qualified female to be the Vice President of Compensation. This matter is before the Court on Lincoln Life's Motion for Summary Judgment [DE 27], filed on March 31, 2006. Because no reasonable jury could conclude that the Defendant failed to promote the Plaintiff because of his sex, the Defendant's Motion will be granted.

## BACKGROUND

On March 14, 2005, the Plaintiff sued the Defendant alleging that various actions taken by the Defendant during the course of his employment constituted sex discrimination and retaliation in violation of federal law. The Plaintiff also asserted a common law claim for intentional infliction of emotional distress. On April 25, the Defendant filed its Answer. On July 11, the Complaint was amended to reflect the Defendant's proper name.

On March 31, 2006, the Defendant moved for summary judgment on all the Plaintiff's claims. On May 4, the Plaintiff responded, specifically opposing summary judgment on his claim

that the Defendant's failure to promote him to the Vice President of Compensation position was motivated by his gender. As to his other claims, for retaliation and intentional infliction of emotional distress, the Plaintiff acknowledged that he could not withstand summary judgment and abandoned those claims. The Defendant's reply, filed on May 24, focused solely on the Plaintiff's remaining claim for failure to promote.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

2

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248–50. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Comm'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443. However, under Northern District of Indiana Local Rule 56.1(b), the Court is to assume that the facts claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible

evidence.

## MATERIAL FACTS

**A.     The Parties**

The Defendant is a financial services company that manages and provides annuities, life insurance, 401K plans, mutual funds, financial planning services, and similar investment and insurance products. Lincoln Life is one of the subsidiaries of Lincoln National Corporation (LNC), which is a diversified financial services holding company headquartered in Philadelphia, Pennsylvania.

The Plaintiff was hired by Lincoln Life in May 2001 to be the Director of Compensation. Shortly thereafter, he was promoted to an assistant vice president position. In 2003, he was promoted to Second Vice-President of Rewards, Systems, and Human Resources Planning. In April 2003, the Plaintiff's manager, Joe Pollino, told George Davis, the Senior Vice President of Human Resources at LNC, that the Plaintiff would be ready for a promotion to a vice president position within six months.

In the thirteen years before he worked for the Defendant, the Plaintiff worked in the compensation and benefits areas for various companies. In these positions he obtained experience in executive compensation, board of directors consultation, compensation program development, job analysis and pay structures, bonus and incentive programs, performance management systems, competitive market reviews, health and benefit programs, and other compensation-related functions.

The Plaintiff's employment with Lincoln Life ended on April 1, 2004, as a result of a reorganization and centralization of LNC's and its subsidiaries' human resources functions.

### B. Human Resources Transformation Core Team

LNC oversees the core, or essential, functions of Lincoln Life and its other subsidiaries. One of these core functions is human resources. In mid 2003, LNC began an "HR Transformation" project to revamp its human resources service delivery model and to reduce human resources costs. It was a fast paced, deadline-intensive project. To formulate and lead the HR Transformation, LNC created a Core Team of representatives from the various LNC businesses. This Team was led by Karen Ruef, who had joined LNC in July 2000 as Vice President for Executive Resources. The Plaintiff was also a member of the Core Team. He had been chosen by his manager, Pollino, to be the Lincoln Life representative on the Team.

The Plaintiff's role on the Core Team was to work across all LNC's businesses to develop job codes and compensation. In December 2003, Ruef removed the Plaintiff from the Core Team because his performance was not meeting her expectations.

### C. Vice President of Compensation Position

As part of the HR Transformation, Human Resources was split into four different areas, or "Centers of Excellence" (COE): Compensation; Talent Management; Employee Relations and Diversity; and Benefits and Administration. The COEs would be centralized at LNC in Philadelphia and there would no longer be employees working in these areas at the separate business units. This change would result in new vice president positions for each COE. One such position was the Vice President of Compensation, who would lead the Compensation COE.

A job description for this new position was created by the HR Transformation Core Team. It included a description of the job, its requirements, and desirable skills and experience of the

5

person who would fill the position. Davis, who was responsible for hiring the vice presidents who would report to him, did not consult the job description when selecting the VP of Compensation. However, he testified in his deposition that it looked like a "pretty good definition of the job," provided a fair description of the requirements for the job, and that there was nothing in the description that he did not know about. (Davis Dep. 71–73.) The requirements for the job included partnering with others, functional expertise in compensation practices, and working with boards, committees, and CEOs. Davis testified that he did not consider functional expertise as important as the other requirements because his strong background in compensation would enable him to mentor the appointed person in those areas. As for the Skills & Experience portion of the description, Davis testified that it was a good description of the skills and experience "you would like to have for that position." (Davis Dep. 75.) He also testified that, in addition to what was listed (led a compensation function of a publicly traded company for at least 5 years; advanced level of knowledge of executive compensation design/support tools and technology and incentive design and job pricing methodologies; 7 to 10 years experience in progressively responsible compensation or related roles; strong business acumen), it would be important to have a "good strategic mind." (*Id.*)

D.   **Selection of VP of Compensation**

Davis met with the Plaintiff in August 2003. During this meeting, the Plaintiff indicated his interest in the newly created position of Vice President of Compensation. The Plaintiff presented his qualifications, including the fact that he was a member of the Core Team, the chair of the benefits appeals committee, and that he had led a compensation function of a publicly traded company for five years. Davis indicated that LNC was going outside the company to select the VP

6

of Compensation because it needed someone who could work with its Board of Directors. The Plaintiff reminded Davis of his experience working with various boards. Davis agreed to consider the Plaintiff for the position.

Ultimately, Davis did not select the Plaintiff and on October 22, 2003, he met with the Plaintiff to advise him that he had not been chosen to lead the Compensation COE. Davis told the Plaintiff that he had selected someone inside the company for the position. He would not, at that time, reveal who had been selected, but did tell the Plaintiff that the person was already in a vice president position. The Plaintiff told Davis that he did not agree with the decision.

The person Davis chose for the Vice President of Compensation position was Ruef. Davis testified in his deposition that his selection was impacted by succession planning for his own position. Ruef had made it clear to Davis and LNC's Chief Executive Officer, Jon Boscia, when she was hired in 2000 from a high-level position with another company, that she wanted to be a candidate for the senior HR position. They agreed when they hired her that she would be a candidate for Davis's position when he retired.

Putting Ruef in charge of compensation was intended to give her more experience in an area that Davis considered important in his job. Davis testified that Executive Compensation was one of two critical areas that he worked on with the board. The other was Talent Management. Davis thought that Ruef's background in Talent Management was one of the best in the country; she was already acting as LNC's Vice President of Talent Management.[1] Davis recognized, however, that Ruef's executive compensation experience was limited. In fact, he testified that the Plaintiff had

---

[1] Ruef's VP position was a higher level position than the Plaintiff's Second VP designation. Both positions were junior to Davis's Senior Vice Presidency. After Davis appointed Ruef as the Vice President of Compensation, she continued to perform her duties as the Vice President of Talent Management.

more compensation knowledge and experience than Ruef. Nevertheless, because Davis's own background in this area was strong, he thought he could mentor Ruef to develop that area and that, given this exposure to compensation, she would become even more qualified to potentially replace him when he retired.

Davis also considered Ruef a viable candidate to replace him because of her success leading the HR Transformation Core Team.[2] Davis had selected Ruef to lead the Core Team because an outside consulting firm had assessed Ruef's potential to fill Davis's position and recommended that she lead a substantial project that was outside of her comfort zone. Davis knew that Ruef was very strategic and good at talent management and assessing people for jobs, but she had never managed a big project with specific deadlines. Giving her the leadership role on the HR Transformation Core Team was meant to test and develop her in areas outside her known strengths. (Davis Dep. 56–57.)

Davis discussed these matters with Boscia who agreed that, with succession in mind, Ruef was the best choice to fill the VP of Compensation position. Davis testified that, once succession planning was considered, he did not consider the Plaintiff as a candidate to head the Compensation COE. He did not interview the Plaintiff for the position and there were no other applicants.

Although there were no other applicants, Davis testified that he did consider two other people for the job, both of whom were already heading HR departments at business units and also considered to be potential candidates for Davis's position. These two individuals, while they did not receive the VP of Compensation position, were also placed in positions that would develop them further for taking over Davis's job as the Senior Vice President of Human Resources.

---

[2]Although the HR Transformation Team was not disbanded until June 1, 2004, and Davis selected Ruef in October 2003, Davis testified that by October, the project was "virtually" finished and that, by then, the Defendant had decided to centralize all of the HR functions and create COEs. (Davis Dep. 78–79.)

The Plaintiff contends that the Defendant's explanation for hiring Ruef over the Plaintiff is continually shifting. (Pf.'s Resp. Summ. J. 10.) As evidence, the Plaintiff points to discovery responses and to the Defendant's representations to the EEOC. For example, in response to interrogatories, the Defendant stated that Davis did not select the Plaintiff because he "was not the most qualified candidate for the position." (Answer No. 10 of Defendant's Responses to Plaintiff's First Set of Interrogatories.) The Defendant represented to the EEOC that Ruef was selected for the position "because of her broad skills and experience at a corporate level."

The Plaintiff maintains that he was the most qualified person for the Vice President position because of his superioer knowledge and experience in compensation.

**DISCUSSION**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). An employee may prove that an employer violated Title VII by providing either direct or indirect evidence of unlawful discrimination. [D]irect evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000). Because such admissions are rare, a plaintiff may also "prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). This circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Jordan v. City of Gary,* 396 F.3d 825, 832 (7th Cir. 2005).

9

When a plaintiff has no direct evidence of discrimination, he can create a triable issue of fact as to whether he was discriminated against on the basis of his sex and survive summary judgment through the familiar burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This analysis provides a means of evaluating indirect evidence of discrimination at the summary judgment stage. *Oest v. Ill. Dept. of Corrs.*, 240 F.3d 605, 612 (7th Cir. 2001).

The Plaintiff contends that summary judgment is not appropriate in this case because he can offer evidence from which an inference of discrimination may be drawn under the indirect method of proof. In general, to establish a prima facie case of discrimination in a failure to promote case, a plaintiff must show that: 1) he belongs to a protected class; (2) he applied for and was qualified for a promotion; (3) he was rejected for the promotion; and (4) the person selected for the promotion had similar or fewer qualifications for the job. However, the *McDonnell Douglas* prima facie case is modified in reverse discrimination cases because it "is the unusual employer who discriminates against majority employees." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456–57 (7th Cir. 1999). In reverse discrimination cases, the first element becomes a non-issue and the courts must be flexible in applying the indirect method of proving discrimination. *Gore v. Ind. Univ.* 416 F.3d 590, 592 (7th Cir. 2005). "[A]dditional steps are needed before an inference of reverse-discrimination can be drawn." *Id.* at 593. To meet the first prong of the prima facie case, the plaintiff must show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against . . . [men] or evidence that there is something 'fishy' about the facts at hand." *Id.* at 592 (quoting *Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003)); *Mills*, 171 F.3d at 455, 57 (stating that a plaintiff in a reverse discrimination case must show at least one of the background circumstances to support an inference that the

10

defendant is one of those unusual employers who discriminates against the majority).

> The contours of what constitutes a background circumstance are not precise. In *Harding* [*v. Gray*, 9 F.3d 150 (D.C. Cir. 1993)], the D.C. Circuit enumerated two categories of circumstances: "evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites [or men]," and "evidence indicating that there is something 'fishy' about the facts of the case at hand." *Id.* (citations omitted). Plaintiffs in that circuit have shown something was 'fishy' when they presented evidence of schemes to fix performance ratings to their detriment, that the hiring system seemed rigged against them because it departed from the usual procedures in an "unprecedented fashion," or that they were passed over despite superior qualifications. *Id.* at 154 (citations omitted). Another court, applying a variant of the *McDonnell Douglas* test in a reverse discrimination *Bivens* action, held that background circumstances could include situations in which: the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a woman, and there was a pattern of hiring women in the past. *Duffy v. Wolle*, 123 F.3d 1026, 1036–37 (8th Cir.1997), *cert. denied*, 523 U.S. 1137, 118 S. Ct. 1839, 140 L. Ed.2d 1090 (1998). Additionally, in *Reynolds v. School Dist. No. 1, Denver, Colorado*, the plaintiff successfully showed background circumstances where she was the only white employee in the department and nearly all of the decision makers were Hispanic. 69 F.3d 1523, 1534 (10th Cir.1995).

*Mills*, 171 F.3d at 455 (second alteration in original).

The Seventh Circuit has identified two situations in which it is "plausible to expect that men might discriminate against men and in favor of women." *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005). These include where the "men running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity' to increase the proportion of women in the company's workforce" and where the men running the company are fixated on a stereotype for jobs that are traditional "women's work." *Id.* When a plaintiff does not present any reason why men might be expected to discriminate against other men, the plaintiff must go beyond the "bare fact that a woman got a job that a man wanted to get" to raise a triable issue of discrimination. *Id.* In *Preston*, the Seventh Circuit offered, without elaboration, that a "gross disparity in qualifications" might be such

evidence. *Id.*

If a plaintiff establishes a prima facie case, the burden shifts back to the defendant to establish a legitimate, non-discriminatory reason for its decision not to promote the plaintiff. *See Gore*, 416 F.3d at 592. "An employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Rudin v. Lincoln Land Comty. Coll.*, 420 F.3d 712, 725 (7th Cir. 2005) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). Once an employer meets this burden of production, the plaintiff must show that the employer's proffered reason is pretextual. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)).

The parties' arguments in this case do not fall neatly into the burden-shifting analysis for reverse discrimination, but tend to overlap and merge. Whether the parties are discussing the elements of a prima facie case for reverse sex discrimination, the Defendant's proffered legitimate business reason for appointing Ruef, or pretext, much of the dispute in this case centers around the Plaintiff's qualifications, particularly in comparison to Ruef's.

The Plaintiff claims that a gross disparity in their qualifications establishes the first prong of the reverse discrimination prima facie case because it creates an inference that the Defendant's selection of Ruef for the Vice President of Compensation position was fishy. (The Plaintiff couples this with evidence that the majority of employees in the four COEs were female.) The Defendant disagrees that there is any gross disparity and, in fact, contends that the Plaintiff cannot even satisfy

the fourth prong of a prima facie case because Ruef was more qualified than the Plaintiff because she was already a Vice President and, unlike the Plaintiff, was considered a potential candidate to succeed Davis. The Defendant acknowledges that Ruef was not as experienced as the Plaintiff in compensation, but explains that Davis believed he could mentor her in this area, thereby adding to her already strong expertise in talent management and further developing her as a potential candidate to take his place as the Senior Vice President of Human Resources. The Plaintiff, in turn, claims that this reason was pretextual, not only because of the disparity in qualifications, but because the timing of Davis's purported decision to consider succession planning was suspicious. The Plaintiff also argues that the Defendant's stated reasons for selecting Ruef are shifting and inconsistent and, therefore, cannot be believed.

Although the Court is not convinced that the Plaintiff has established that the Defendant is one of those rare employees that discriminates against males, or that Ruef had similar or fewer qualifications, it will assume that the Plaintiff has established a prima facie case of sex discrimination and concentrate on the whether the Defendant's non-discriminatory reasons for selecting Ruef are pretext. *See, e.g., Ransom v. CSC Consulting, Inc.,* 217 F.3d 467, 470 (7th Cir. 2000) (bypassing the prima facie case where defendant presented evidence of a legitimate non-discriminatory reason for termination and there was no evidence of pretext); *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) ("When the defendant has proffered an explanation for termination that the court determines to be non-pretextual, the court may avoid deciding whether the plaintiff has met his prima facie case and instead decide to dismiss the claim

because there is no showing of pretext.").[3]

The Defendant has proffered a non-discriminatory reason for selecting Ruef: it contends that it selected her because she was a potential candidate to fill Davis's position and the VP of Compensation position would provide good background to further prepare her to replace Davis. Curiously, the Plaintiff does not refute that Ruef was a candidate to replace Davis. Nor does he submit that he was a potential candidate for Davis's job. Instead, he focuses solely on the VP of Communications position and relies solely on its written job description to argue that he was more qualified than Ruef.

The Plaintiff's comparison of qualifications using only the written job description is incomplete because it ignores a critical component of the Defendant's explanation, succession planning. The Plaintiff argues in his response to the Defendant's Motion for Summary Judgment that, by focusing on subjective criterion determined by Davis, the Defendant is attempting to shift focus "away from the position at issue—the Vice President of Compensation position as characterized by Defendant's own Job Description—and onto a different sort of position, one tailor-made for Ruef, for which, obviously, only Ruef would have superior qualifications." (Pf.'s Resp. 22.) Normally, when a plaintiff seeks to prevent summary judgment on the strength of relative qualifications, he must have credentials so superior to those of the person selected such that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180–81 (7th Cir.

---

[3] The Court is aware that the Seventh Circuit does not always embrace this approach. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 273 (7th Cir. 2004) (noting the court's disfavor of bypassing the prima facie case because it is a condition precedent to the pretext analysis). However, the Court finds it particularly appropriate here where the facts and issues surrounding the Plaintiff's prima facie case, the Defendant's legitimate non-discriminatory reason, and pretext overlap and merge.

14

2002) (internal citation and quotation omitted). Here, the Plaintiff does not assert that he was the superior candidate for the head HR position. Instead, he limits his discussion of relative qualifications to the written job description for the VP of Communications position, and does not address his credentials for the VP of HR position.

The Plaintiff cannot establish pretext using this limited comparison unless he first shows that succession planning was not actually considered and that the written job description was the only source used to determine who was qualified for the "position at issue." But it is the Defendant, not the Plaintiff, who defines the position at issue. And the Defendant determined that it would be best served by using the compensation position to groom and develop one of its existing vice presidents in anticipation of Davis's retirement. Title VII does not prohibit an employer from making a business decision to develop an employee for a future promotion or job vacancy, as long as it does not discriminate on the basis of protected characteristics in the process. *See, e.g., Guerro v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001) (holding that the court is "not a super-personnel board . . . and that [it] may not punish an employer for choices that constitute business decisions alone"). A court's role is to prevent unlawful employment practices, not to second-guess an employer's business decisions; a court "must respect the employer's unfettered discretion to choose among qualified candidates." *Millbrook*, 280 F.3d at 1181 (internal citation and quotation omitted). The Plaintiff may think it unfair, or even unwise, that the Defendant did not strictly adhere to the requirements and experience set forth in the written job description, for he did have more compensation experience, but he has not established that Davis did not actually take succession planning into account, or that this reason was insufficient to motivate him, when he selected Ruef for the VP of Compensation position. *See Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) ("Even if the reasons for [the Plaintiff's]

non-selection were mistaken, ill considered or foolish, so long as [the Defendant] honestly believed those reasons, pretext has not been shown."); *Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004) (A plaintiff may establish that an employer's reason is unworthy of belief, by showing that the proffered reasons are factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action). Nor has the Plaintiff established that Davis did not believe, as part of the development and succession planning, that functional expertise was not as important as other skills because he could teach those aspects of the job. Merely disagreeing with the employer's assessment of what was important for the job, whether because of long term goals or otherwise, is not sufficient to establish pretext.

The Plaintiff does make some efforts to show that Davis did not actually take succession into account. He points to suspicious timing, arguing that Davis indicated that he did not consider Ruef as a potential successor until after she had completed the HR Transformation project. He submits that because Davis actually decided to award Ruef the VP of Compensation position before the project was completed, her performance on that project and succession planning could not have been a reason to select her. The Defendant responds, and the Court agrees, that this argument relies on a mischaracterization of Davis's testimony. Davis did not testify that he only considered succession after Ruef successfully completed the HR Transformation Project. Moreover, when he selected Ruef in October, the Core Team had been together since mid-year and had already decided to create the COEs. There is no evidence to suggest that Ruef had not worked on the project long enough for Davis to evaluate her performance. In addition, the evidence shows that Ruef was considered a potential successor to Davis even before her work on the HR Transformation project. When Ruef left her high-level position with another corporation to work with LNC, Davis and Boscia assured

her that she would be considered as a potential candidate to replace Davis when he retired. In fact, one of the reasons she was selected to lead the Core Team was to give her responsibilities in areas that were outside her known strengths so that LNC could better assess her ability to fill the head HR position.

The Plaintiff also points to inconsistent explanations as evidence that the Defendant's reasons for selecting Ruef were a pretext for discrimination. However, the explanations cited by the Plaintiff are not, as he contends, shifting and inconsistent. In response to interrogatories, the Defendant stated that Davis did not select the Plaintiff because he "was not the most qualified candidate for the position." (Answer No. 10 of Defendant's Responses to Plaintiff's First Set of Interrogatories.) The Defendant represented to the EEOC that Ruef was selected "because of her broad skills and experience at a corporate level." Although the Defendant does not use the precise same wording to defend its decision each time, these explanations are not in conflict with each other. They represent generally the company's belief that Ruef, given her previous corporate experience and VP position at LNC, was more qualified than the Plaintiff for higher level positions within the company. That it wanted to use the VP of Compensation position to further develop her as a candidate for such a promotion only verifies this belief.

The Plaintiff simply has not presented evidence that succession planning was a phony reason for selecting Ruef as the VP of Compensation. Therefore, the Plaintiff cannot proceed on his claim that the Defendant discriminated against him on the basis of his sex when it did not promote him to the VP of Communications position. Since the Plaintiff has abandoned or conceded all of his other claims, the Defendant is entitled to summary judgment on all the Plaintiff's claims.

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion for Summary Judgment [DE 27] is GRANTED. Judgment will be entered in favor of the Defendant and against the Plaintiff.

SO ORDERED on June 21, 2006.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT